INDEPENDENT SCHOOL DIST. NO. 2 TULSA COUNTY v. OKLAHOMA TAX COMMISSIONER



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:INDEPENDENT SCHOOL DIST. NO. 2 TULSA COUNTY v. OKLAHOMA TAX COMMISSIONER

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 INDEPENDENT SCHOOL DIST. NO. 2 TULSA COUNTY v. OKLAHOMA TAX COMMISSIONER
2018 OK CIV APP 49
419 P.3d 1281
Case Number: 115678
Decided: 02/09/2018
Mandate Issued: 06/20/2018
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2018 OK CIV APP 49, 419 P.3d 1281

 

INDEPENDENT SCHOOL DISTRICT NO. 2, TULSA COUNTY, OKLAHOMA; INDEPENDENT SCHOOL DISTRICT NO. 52, OKLAHOMA COUNTY, OKLAHOMA; INDEPENDENT SCHOOL DISTRICT NO. 71, KAY COUNTY, OKLAHOMA; INDEPENDENT SCHOOL DISTRICT NO. 20, MUSKOGEE COUNTY, OKLAHOMA; INDEPENDENT SCHOOL DISTRICT NO. 18, JACKSON COUNTY, OKLAHOMA; INDEPENDENT SCHOOL DISTRICT NO. 14, OTTAWA COUNTY, OKLAHOMA; INDEPENDENT SCHOOL DISTRICT NO. 105, BLAINE COUNTY, OKLAHOMA; and INDEPENDENT SCHOOL DISTRICT NO. 2, KIOWA COUNTY, OKLAHOMA, Plaintiffs/Appellees,
v.
OKLAHOMA TAX COMMISSIONER, STEVE BURRAGE; OKLAHOMA TAX COMMISSIONER, DAWN CASH and OKLAHOMA TAX COMMISSIONER, THOMAS E. KEMP, JR., Defendants/Appellants.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE PATRICIA G. PARRISH, TRIAL JUDGE

AFFIRMED AS MODIFIED

Gary Watts, Tulsa, Oklahoma,
Stephanie L. Theban, RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS, P.C., Tulsa, Oklahoma and
Robert A. Nance, RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS, P.C., Oklahoma City, Oklahoma, for Plaintiffs/Appellees

Marjorie L. Welch, FIRST DEPUTY GENERAL COUNSEL, Alan R. Leizear, ASSISTANT GENERAL COUNSEL, OKLAHOMA TAX COMMISSION, Oklahoma City, Oklahoma, for Defendants/Appellants

JOHN F. FISCHER, PRESIDING JUDGE:

¶1 Steve Burrage, Dawn Cash and Thomas E. Kemp, Jr., as the Commissioners of the Oklahoma Tax Commission (Tax Commission) appeal the district court's December 9, 2016 Journal Entry of Declaratory Judgment and Injunction entered in favor of eight Oklahoma Independent School Districts. The Tax Commission also appeals the denial of its motion to dismiss, based on the plaintiffs' failure to join all school districts as necessary parties, contained in the same judgment. The appeal has been assigned to the accelerated docket pursuant to Oklahoma Supreme Court Rule 1.36(b), 12 O.S. Supp. 2013, ch. 15, app. 1, and the matter stands submitted without appellate briefing. The Tax Commission has misconstrued the effect of a 2015 amendment to section 1104 of the Motor Vehicle License and Registration Act (47 O.S.2011 §§ 1101 through 1151.4) providing for the collection and apportionment of fees, fines and penalties to Oklahoma school districts. As a result, the Commission failed to distribute to the plaintiffs funds they were statutorily entitled to receive. The judgment of the district court is affirmed as modified.

BACKGROUND

¶2 The plaintiffs are eight independent school districts that receive funds collected by the Tax Commission from motor vehicle fees, taxes and penalties pursuant to the Oklahoma Vehicle License and Registration Act. Section 1104 of the Act requires the Tax Commission to distribute a certain percentage of those collections to eligible school districts, including the plaintiffs. During the 2016 fiscal year, July 1, 2015 through June 30, 2016, the plaintiffs received fewer funds than they had received in some months of the 2015 fiscal year. [1] In this suit, they sought a declaratory judgment that their receipt of diminished funds occurred because the Tax Commission misinterpreted and, therefore, misapplied a 2015 amendment to section 1104. The plaintiffs also sought injunctive relief, preventing the Tax Commission from continuing to apply section 1104 as it had since the 2015 amendment.

¶3 In summary, the plaintiffs argue that the statute requires the Tax Commission to distribute at least the same amount of funds distributed in the corresponding month of the previous year, or a proportionate amount thereof, rather than distribute a percentage of the funds collected based on average daily attendance, as it had been doing. The Tax Commission argues that its interpretation of the 2015 amendment to section 1104 is correct, and that the district court should defer to the Tax Commission's "great expertise" in interpreting tax statutes. The Tax Commission also filed a motion to dismiss, arguing that the declaratory judgment statute required the joinder of all school districts that receive a portion of motor vehicle collections, because the amount each received would be affected by any relief obtained by the plaintiffs. The Tax Commission appeals the district court's judgment granting the plaintiffs' motion for summary judgment and enjoining the Tax Commission from apportioning motor vehicle collections to the school districts based on average daily attendance. The Tax Commission also appeals that portion of the district court's judgment denying the motion to dismiss.

STANDARD OF REVIEW

¶4 Appellate review of the ruling on a motion to dismiss involves a de novo consideration as to whether the petition is legally sufficient. Indiana Nat'l Bank v. Dep't of Human Servs., 1994 OK 98, ¶ 2, 880 P.2d 371. Title 12 O.S.2011 § 2056 governs the procedure for summary judgment in this case. A motion for summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." 12 O.S.2011 § 2056(C). An order granting summary judgment disposes of issues that are "purely legal" and is subject to the de novo standard of appellate review. Carmichael v. Beller, 1996 OK 48, ¶ 2, 914 P.2d 1051. De novo review involves a plenary, independent, and non-deferential examination of the district court's rulings of law. Neil Acquisition L.L.C. v. Wingrod Inv. Corp., 1996 OK 125, n.1, 932 P.2d 1100.

¶5 The dispositive legal issue in this case requires the interpretation of 47 O.S.2011 § 1104. Legal issues involving statutory interpretation are also questions of law, subject to de novo review. Raymond v. Taylor, 2017 OK 80, ¶ 9, ___ P.3d ___ (citing Head v. McCracken, 2004 OK 84, ¶ 4, 102 P.3d 670; Fulsom v. Fulsom, 2003 OK 96, ¶ 2, 81 P.3d 652). "[S]tatutes are construed to determine legislative intent in light of the general policy and purpose that underlie them." Troxell v. Okla. Dep't of Human Servs., 2013 OK 100, ¶ 4, 318 P.2d 206.

ANALYSIS

I. The Tax Commission's Motion to Dismiss

¶6 The Tax Commission's motion to dismiss cites 12 O.S.2011 § 1653: "When a declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration . . . ." According to the Tax Commission, all of the school districts that receive a portion of motor vehicle collections would be affected by any declaratory judgment in favor of the plaintiffs, because any increase in the amount distributed to the plaintiffs would reduce the amount available for distribution to the non-plaintiff school districts. The Tax Commission contends, therefore, that those school districts "shall be made parties." Id. The Tax Commission cites no authority, other than the language of the statute, for the proposition that "shall" as used in section 1653 is mandatory. Nonetheless, that is a common tenant of statutory construction. "The use of 'shall' by the Legislature is normally considered as a legislative mandate equivalent to the term 'must', requiring interpretation as a command." Oglesby v. Liberty Mut. Ins. Co., 1992 OK 61, ¶ 19, 832 P.2d 834 (emphasis added). But, as the plaintiffs point out, the word "shall" in section 1653 has not always been interpreted as mandatory, requiring the joinder of all parties who have an interest that may be affected by the litigation.

¶7 In Reed v. City of Bartlesville, 1973 OK CIV APP 2, ¶ 11, 510 P.2d 1013, this Court observed: "In spite of the word 'shall' the joinder requirement [in section 1653] is not mandatory in the sense that all parties who might be affected by a declaration must be joined but only those necessarily and directly affected thereby." Reed held that all property owners affected by a zoning ordinance were not required to be joined in a declaratory judgment action challenging that ordinance. The Reed Court relied, in part, on an article written at the time section 1653 was adopted. See George B. Fraser, Oklahoma's Declaratory Judgment Act, 32 Okla.B.J. 1447 (1961). In that article, Professor Fraser stated that "the joinder requirement is not mandatory in spite of the use of the word 'shall.'" Id. at 1450. And, in a footnote, he concluded: "Obviously, when the validity of a statute is challenged, all interested persons cannot be joined." Id. at n.32. This Court has concluded that "nonjoinder is not an automatic deficiency." Constr. Res. Corp. v. Courts, Ltd., 1979 OK CIV APP 1, ¶ 12, 591 P.2d 335.

¶8 In Oliver v. City of Tulsa, 1982 OK 121, 654 P.2d 607, the Supreme Court cited Reed, Construction Resources and decisions from other jurisdictions in support of its holding that one of the five hundred members of an association was the proper and only necessary party to a declaratory judgment action. That member sought a determination of rights pursuant to a collective bargaining agreement, and "there was no showing of any controversy between him and any members of the association." Id. ¶ 38. However, the Court reversed that portion of the judgment awarding specific sums of money to individual members of the association, based on its finding that they were "necessary parties in a proceeding to determine whether they were entitled to personal judgments." Id. ¶ 39.

¶9 Although we agree with the authority that "shall" as used in section 1653 is not mandatory, that does not resolve the joinder issue raised by the Tax Commission's motion to dismiss. The manner in which section 1104 is interpreted affects the interests of the plaintiffs and some of the non-plaintiff school districts differently. As the Tax Commission points out, only a limited amount of money is available for distribution to the eligible school districts. And, the amount received by any particular school district is not the same if distributed based on average daily attendance rather than on a historical basis determined by an amount previously received.

¶10 However, the issue framed by the plaintiffs is not how much money each district should receive for the 2016 fiscal year. The issue is whether the Tax Commission's interpretation of the 2015 amendment to section 1104 is correct. As the plaintiffs acknowledged in their response to the Tax Commission's motion to dismiss, their petition does not seek any monetary relief; it is limited to "declaratory and injunctive relief." And the plaintiff school districts "are not asking for any money back from the Tax Commission [or from] any school district. They simply want the apportionments to be correct in the future."[2] When the issue is the proper construction of a statute, it is not always necessary that all parties potentially affected by the result be joined in the action. See, e.g., Naifeh v. State ex rel. Okla. Tax Comm'n, 2017 OK 63, 400 P.3d 759 (deciding the constitutionality of a proposed tax without joinder of all potential beneficiaries of the tax); Murray Cnty. v. Homesales, Inc., 2014 OK 52, 330 P.3d 519 (deciding all counties' rights to collect taxes pursuant to the Documentary Stamp Tax Act, 68 O.S.2011 §§ 3201 through 3206, in an action brought by only two of the seventy-seven affected counties); Deutsche Bank Nat'l Trust v. Brumbaugh, 2012 OK 3, 270 P.3d 151 (construing provisions of Article Three of the Oklahoma Uniform Commercial Code in a mortgage foreclosure action involving only one of numerous affected lenders); In re: Initiative Petition No. 379, 2006 OK 89, 155 P.3d 32 (holding invalid an initiative petition filed by a "diverse political and economic group of Oklahoma citizens," but not all of the qualified voters). Because the plaintiffs' case is consistent with these types of cases, we find it unnecessary to address the "public interest" exception to the joinder requirements argued by the plaintiffs and relied on by the district court. See also Nat'l Licorice Co. v. NLRB, 309 U.S. 350, 60 S. Ct. 569 (1940). We hold that the non-plaintiff school districts were not required to be joined in this declaratory judgment action and affirm the district court's denial of the Tax Commission's motion to dismiss.

II. The Declaratory Judgment Action

¶11 The substantive issue in this appeal concerns the proper interpretation of a 2015 amendment to section 1104 of the Motor Vehicle License and Registration Act. Section 1104 generally provides that the Tax Commission will distribute all motor vehicle fees, taxes and penalties it collects to eligible school districts and other governmental entities.[3] Of particular importance in this appeal are subparagraphs B(2)(a) and B(2)(b) of the 2015 version (hereafter, 2(a) and 2(b) for all versions of the statute unless otherwise noted). Subparagraph 2(a) provides, as it has since the statute's inception, that funds will be apportioned so that each district receives the same amount received in the corresponding month of the previous year. Subparagraph 2(b) provides that, in case of a previous deficit, any excess funds will be distributed so that each district receives the "cumulative total" it was entitled to, but had not yet received, pursuant to subparagraph 2(a). Any funds remaining at that point are to be apportioned based on average daily attendance as provided in the second part of subparagraph 2(b).

¶12 The facts in this case are not disputed and concern the apportionment of motor vehicle collections to 419 Oklahoma school districts for fiscal year 2015, July of 2015 through June of 2016. In each of those months, except for September and December of 2015 and March of 2016, the amount collected and distributed was less than the amount collected and distributed in the corresponding month of the preceding year. In those deficit months, the Tax Commission distributed, pursuant to the second part of subparagraph 2(b), the available funds to the school districts based on average daily attendance. In each of the three months when collections exceeded the amount collected in the corresponding month of the preceding year, the Tax Commission distributed, as required by subparagraph 2(a), sufficient funds for each district to receive the same amount that it had received in that month of the preceding year. However, the remaining funds were distributed based on average daily attendance rather than pursuant to the "cumulative total" requirement of the first part of subparagraph 2(b).

¶13 As the plaintiffs point out, in using this method the Tax Commission disregarded subparagraph 2(a) in the nine deficit months as well as the "cumulative total" provision of subparagraph 2(b) in the three excess collection months. An understanding of the purpose of the statute as evident from its historical context is necessary to determine whether the Tax Commission's interpretation of the 2015 amendment to section 1104 is correct.

A. The Evolution of Section 1104 Funding

¶14 Partial funding for Oklahoma schools from fees, taxes and penalties collected pursuant to this Motor Vehicle License and Registration Act began in 1985 with the enactment of the original version of section 1104. Thereafter, an eligible school district received "the same amount of funds as such district received from the taxes and fees provided in this act in the corresponding month of the preceding year." 47 O.S. Supp. 1985 § 1104(B)(1)(a), now B(2)(a).[4] Although the percentage of all motor vehicle collections apportioned to the school districts has varied over time, this method for allocating the amount distributed to the school districts remained relatively unchanged until 2017.

¶15 Section 1104 has been amended numerous times, but for historical purposes, the 1997 version of that statute is relevant to this case. And, it was the version in effect immediately prior to the 2015 amendment. The 1997 statute provided that thirty-five percent (35%) of all motor vehicle collections were to be apportioned to eligible school districts according to the following formula:

a. except as otherwise provided in this subparagraph, each district shall receive the same amount of funds as such district received from the taxes and fees provided in this title in the corresponding month of the preceding year. . . .

b. any funds remaining unallocated following the allocation provided in subparagraph a of this paragraph shall be apportioned to the various school districts so that each district shall first receive the cumulative total of the monthly apportionments for which it is otherwise eligible under subparagraph a of this paragraph and then an amount based upon the proportion that each district's average daily attendance bears to the total average daily attendance of those districts entitled to receive funds pursuant to this section. . . .

c. if, for any month, the funds available are insufficient to provide the total allocation required in subparagraph a of this paragraph, each district shall receive a proportionate share of the funds available based upon the proportion of the total revenues that such district received in the corresponding month of the preceding year.

47 O.S. Supp. 1997 § 1104(A)(2) (section 1104(B)(2) of the 2015 version). This is the same formula that had been used since 1987. See 47 O.S. Supp. 1987 § 1104(B)(2).

¶16 In 2000, section 1104 was amended, to gradually increase the percentage of motor vehicle collections apportioned to the school districts and ensure that the money received by the school districts would not "be less than the monies apportioned in the previous fiscal year." 47 O.S. Supp. 2000 § 1104(M). In addition, subparagraph 2(c) was repealed, eliminating the proportionate reduction provision applicable in deficit collection months.

¶17 Thereafter, and until the 2015 amendment, motor vehicle collections were to be disbursed pursuant to subparagraphs 2(a) and 2(b), and paragraph M, in order for each eligible school district to receive at least the same amount it had received in the previous fiscal year. However, during that time, according to the affidavit of the Tax Commission official charged with apportioning motor vehicle collections to the school districts, "for any month in which the amount to be apportioned was less than the amount apportioned to the school districts in the same month of the previous year, the hold harmless provision was applied resulting in monies that would have otherwise gone to the general fund being used to ensure school districts received no less than in the previous year."

¶18 "Hold harmless" is a concept usually associated with a contractual agreement by one party to assume the potential liability of another party. Black's Law Dictionary 658 (5th ed. 1979). The term has also been used in reference to another aspect of school funding but unrelated to this case. See Fair Sch. Fin. Council of Okla., Inc. v. State, 1987 OK 114, 746 P.2d 1135 (Wilson, J., dissenting). We understand the Tax Commission's use of the term in this case to refer to the allocation of funds to the school districts necessary to ensure that the districts received on a monthly basis, through subparagraphs 2(a) and 2(b), or on an annual basis, through paragraph M, not less than the same amount received for the corresponding time period of the previous year. Although the Tax Commission interprets the 2000 version of section 1104 as containing two "hold harmless" provisions, the affidavit refers only to the latter. This is apparent from the reference in the next sentence of the affidavit to the 2015 repeal of the "hold harmless provision," i.e., paragraph M. The 2015 amendment did not alter, change or affect subparagraphs 2(a) and 2(b).

¶19 The Tax Commission's approach during the 2000 to 2015 time period is confusing. The "hold harmless" provision in paragraph M did not specify how monthly collections were to be apportioned. That provision provided that the school districts would not receive "less than the monies apportioned in the previous fiscal year." 47 O.S. Supp. 2000 § 1104(M). Consequently, paragraph M provides for any annual reconciliation necessary to ensure that the funds received in one fiscal year were not less than those received in the prior fiscal year, but only when the monthly distributions made pursuant to subparagraphs 2(a) and 2(b) were insufficient to make up any annual deficit. Only subparagraphs 2(a) and 2(b) specify how the Tax Commission is to apportion the available funds in any particular month.

¶20 Nonetheless, this appears to be the method used by the Tax Commission from 2000 until July 1, 2015, the effective date of the 2015 amendment to section 1104. The 2015 amendment fixed the percentage of motor vehicle collections distributed to the school districts at thirty-six and twenty one-hundredths percent (36.20%). However, the hold harmless provision in paragraph M -- now renumbered as paragraph N -- was repealed. As a result, the school districts were no longer guaranteed the same amount received in the previous fiscal year. And, the total amount the school districts could receive was now capped: "in no event shall the amount apportioned in any fiscal year [to the school districts] exceed the total amount apportioned for the fiscal year ending on June 30, 2015." 47 O.S. Supp. 2015 § 1104(B)(2)(d). Any excess was "placed to the credit of the General Revenue Fund." Id.

¶21 Subparagraphs 2(a) and 2(b) were not affected by the 2015 amendment. Consequently, the method for distributing the thirty-six and twenty one-hundredths percent (36.20%) of motor vehicle collections among the eligible school districts on a monthly basis remained unchanged. First, each district was to receive "the same amount of funds as such district received . . . in the corresponding month of the preceding year." 47 O.S. Supp. 2015 § 1104(B)(2)(a). Second, any remaining funds were to be distributed "so that each district shall first receive the cumulative total of the monthly apportionments for which it is otherwise eligible under subparagraph a . . . ." 47 O.S. Supp. 2015 § 1104(B)(2)(b). Third, any funds unallocated at that point were to be distributed based on a percentage determined by average daily attendance. Id. 

B. The Plaintiffs' Interpretation

¶22 It is not disputed that the total amount of motor vehicle collections that the Tax Commission apportioned to the plaintiffs in fiscal year 2016 was less than those districts received in the 2015 fiscal year, and that in only three months of fiscal year 2016 did the plaintiffs receive an amount equal to the amount received in the corresponding month of the preceding fiscal year. The plaintiffs allege that the deficit funding they received resulted from the Tax Commission's misinterpretation of the 2015 amendment to section 1104. They argue that the Tax Commission completely disregarded the "cumulative total" provision of subparagraph 2(b) and was wrong to conclude that subparagraph 2(a) did not permit the proportionate distribution of funds in months when the available funds were less than the total funds distributed in the corresponding month of fiscal year 2015.

C. The Tax Commission's Interpretation

¶23 The Tax Commission contends that after July 1, 2015, in months when the funds available for distribution were insufficient to distribute the same amount the school districts received in the corresponding month of the preceding year, the Tax Commission was required to distribute the available funds based on a school district's average daily attendance because there was no other statutory provision applicable in such circumstances. Specifically, the Tax Commission argues that the 2000 repeal of subparagraph 2(c) left it with no statutory authority to distribute, on a monthly basis, less than the amount previously distributed. According to the Tax Commission, in months when the amount available for distribution was less than the total amount distributed to the school districts in the corresponding month of the previous year, subparagraph 2(a) did not apply because it was impossible for "each district [to] receive the same amount of funds as such district received . . . in the corresponding month of the preceding year." 47 O.S. Supp. 2015 § 1104(B)(2)(a). The Tax Commission's narrow focus after the 2015 amendment on only a portion of the language of subparagraph 2(a) infuses that language with a new meaning it had not previously had and "leads to an inconsistent or incongruent result." Hogg v. Okla. Cnty. Juvenile Bureau, 2012 OK 107, ¶ 7, 292 P.3d 29. We are required, therefore, to "utilize rules of statutory construction to reconcile the discord and ascertain the legislative intent." Id.

III. The Effect of the 2015 Amendment

¶24 The Tax Commission asserts two arguments in support of its interpretation of the 2015 amendment to section 1104. First, it argues that the courts should defer to the Tax Commission's expertise in this area. Second, the Tax Commission argues that it has properly interpreted the 2015 amendment and the amendment's effect. We find neither argument persuasive.

A. The Tax Commission's Deference Argument

¶25 The Tax Commission correctly argues that its expertise in construing and administering tax statutes is entitled to some persuasive value. "[T]he contemporaneous construction of a statute by those charged with its execution and application, especially when it has long prevailed, while not controlling, is entitled to great weight and should not be disregarded or overturned except for cogent reasons . . . ." Oral Roberts Univ. v. Okla. Tax Comm'n, 1985 OK 97, ¶ 10, 714 P.2d 1013. Of equal importance, however, is the principle that where the Legislature has "convened many times during this period of administrative construction," or "amends the statute or re-enacts it without overriding such construction," the Legislature may be regarded as having acquiesced in or approved of the administrative construction. Id. ¶ 17. Here, the Legislature amended section 1104 numerous times between 1985 and 2015 without altering subparagraphs 2(a) and 2(b) or the method of distribution the Tax Commission understood those provisions to require. When the Legislature is regarded as having adopted the Tax Commission's construction, "the Commission may not with the stroke of a pen undo it." Id. ¶ 19.

¶26 Further, construction of section 1104 and the 2015 amendment thereto does not require any particular technical or scientific knowledge, skill or expertise. "This is simply a matter of determining what a statute means, and that is within the expertise of the courts." Dobson Tel. Co. v. State ex rel. Okla. Corp. Comm'n, 2017 OK CIV APP 16, ¶ 15, 392 P.3d 295 (approved for publication by the Supreme Court). "This Court and the Oklahoma Supreme Court are 'the ultimate authority on the interpretation of the laws of this State . . . .'" Id. (quoting Robinson v. Fairview Fellowship Home for Senior Citizens, Inc., 2016 OK 42,
¶ 13, 371 P.3d 477).

B. The Tax Commission's Statutory Construction Argument

¶27 The Tax Commission has conceded that, prior to 2015, it had a long history of interpreting subparagraph (2)(a) as a "hold harmless" provision: "The 2015 amendment deleted one 'hold harmless' provision in subsection [M], but did not change the 'hold harmless' provision which has been included in paragraph (2)(a). . . for a period of more than twenty (20) years." In that twenty, actually thirty- year-period, the Tax Commission had distributed available funds pursuant to subparagraph 2(a), even when the funds available were less than the funds distributed in the corresponding month of the previous year.

¶28 It may be, as the Commission contends, that during most of that time subparagraph 2(c) was in effect. However, subparagraph 2(c) only provided the method for determining the amount each district would receive in months when the available funds were less than those available in the corresponding month of the previous year. Subparagraph 2(a) still provided the authority for apportioning the available funds to the school districts, and the benchmark for determining the amount received by each district, i.e., the amount received in the corresponding month of the previous year. The Tax Commission's interpretation, by contrast, would have prevented any distribution in any deficit collection month and any distribution of the funds collected in excess collection months until the excess funds were sufficient to make up the entire deficit. The Tax Commission avoided that incongruent result by treating paragraph M as authorizing distributions on a monthly basis when necessary to apportion the amount specified in subparagraph 2(a).

¶29 Further, the Commission's interpretation fails to account for the first clause of subparagraph 2(a): "except as otherwise provided in this subparagraph." There are two exceptions "otherwise provided" to the requirement that each school district receive the same amount received in the corresponding month of the preceding year. First, in months when there was an excess, the districts would receive more, as provided in subparagraph 2(b). Second, in months when there was a deficit, the districts would receive less, as provided in subparagraph 2(c). In either case, the amount received was some portion of the funds authorized by subparagraph 2(a).

¶30 The Tax Commission has not explained why the repeal of subparagraph 2(c) in 2000 requires a new interpretation of subparagraphs 2(a) or 2(b). The 2015 amendment did not alter, amend or change the language of either. And, subparagraphs 2(a) and 2(b) had been the subject of a long-standing, consistent administrative and legislative interpretation since 1987. Even after 2000, subparagraph 2(b) still continued to provide a mechanism for apportioning excess funds, when available, to accomplish as nearly as possible the basic allocation of funds contemplated in subparagraph 2(a), when funds available for distribution were insufficient to provide the same amount distributed in the corresponding month of the previous year. The Tax Commission's current construction of subparagraph 2(a) "'must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy.'" Anderson v. Eichner, 1994 OK 136, n.25, 890 P.2d 1329 (quoting Richards v. United States, 369 U.S. 1, 11, 82 S. Ct. 585, 591-92 (1962)). We find no expression of Legislative intent to alter the original intent and application of subparagraphs 2(a) or 2(b) until 2017.

C. The Object and Policy of Section 1104

¶31 Since 1987, the Legislature has contemplated that there may be months in which the funds available for distribution as specified in subparagraph 2(a) would be insufficient. This is clearly evident from the provision in subparagraph 2(c) for proportionate reduction of the amount specified in subparagraph 2(a). But, this intent is equally evident from the language of subparagraph 2(b), which provides a "catch-up" mechanism from excess funds collected in subsequent months when the funds actually distributed in any prior month had failed to meet the threshold specified in subparagraph 2(a). In those months, the excess funds were "apportioned to the various school districts so that each district shall first receive the cumulative total of the monthly apportionments for which it is otherwise eligible under subparagraph [2(a)] . . . ." 47 O.S. Supp. 1987 § 1104(B)(1)(b). Only if an amount less than the amount specified in subparagraph 2(a) had actually been distributed would there be any need for an additional "catch-up" distribution. More importantly, only after the school districts had been "made whole" pursuant to the first part of subparagraph 2(b) was the Tax Commission authorized to apportion funds on the basis of average daily attendance. Id. The Tax Commission's interpretation of the 2015 version of subparagraph 2(a) as prohibiting proportionate distributions in deficit collection months cannot be reconciled with the monthly "catch-up" procedure provided in subparagraph 2(b) of that statute.

¶32 Further, in 2017, section 1104 was amended to delete subparagraphs 2(a) and 2(b) in their entirety. Effective August 25, 2017, the motor vehicle collections available for the school districts are "apportioned to the various school districts so that each district shall receive an amount based upon the proportion that each district's average daily attendance bears to the total average daily attendance of those districts entitled to receive funds . . . ." 47 O.S. Supp. 2017 § 1104(B)(2).

[B]y amending a statute the Legislature may have intended (1) to change existing law or (2) to clarify ambiguous law. The exact intent is ascertained by looking to the circumstances surrounding the amendment. If the earlier version of a statute definitely expresses a clear and unambiguous intent or has been judicially interpreted, a legislative amendment is presumed to change the existing law. Nonetheless, if the earlier statute's meaning is in doubt or uncertain, a presumption arises that the amendment is designed to clarify, i.e., more clearly convey, legislative intent which was left indefinite by the earlier statute's text.

Samman v. Multiple Injury Trust Fund, 2001 OK 71, ¶ 13, 33 P.3d 302 (footnotes omitted). Until July of 2015, the meaning of subparagraphs 2(a) and 2(b), as construed by this Court and by the Tax Commission, had not been in doubt or uncertain. If the repeal of subparagraph 2(c) and later paragraph M created confusion concerning how funds were to be apportioned to the school districts, as the Tax Commission contends, the Legislature could have clarified "existing law" by reinstating subparagraph 2(c), making it clear that the previous method of apportioning funds to the school districts was still provided in subparagraph 2(a). The Legislature did not do this.

¶33 The language of the 2017 amendment and the method of distributing motor vehicle collections to the school districts is so different from the previous method provided in subparagraph 2, that it is clear the Legislature intended to change the existing law by eliminating any apportionment based on amounts historically received. Further, the 2017 amendment cannot be construed as an accident or coincidence. The original version of section 1104 provided that any excess funds would "be apportioned . . . based upon the portion that each district's average daily attendance bears to the total average daily attendance . . . ." 47 O.S. Supp. 1985 § 1104(B)(1)(b). In 1987, that subparagraph was amended to add the "catch-up" method previously discussed, a method unchanged until its repeal in 2017. Consequently, the Legislature was thoroughly familiar with the historical and attendance-based methods of apportioning funds to the school districts. In 2017, the Legislature chose to rely solely on the attendance method. In doing so, the Legislature changed existing law. "The law-making body is presumed to have expressed its intent in a statute's language and to have intended what the text expresses." Yocum v. Greenbriar Nursing Home, 2005 OK 27, ¶ 9, 130 P.3d 213.

¶34 Therefore, it is apparent that even after the 2015 amendment to section 1104, the Legislature intended for subparagraph 2(a) to require an apportionment of available funds even in months when the available funds were insufficient to provide each district with the same amount distributed in the corresponding month of the previous year, and for subparagraph 2(b) to first require the distribution of any excess collections in subsequent months to ensure, as nearly as possible, that the amounts specified in subparagraph 2(a) would be received. Not until 2017 did the Legislature change this method of apportioning motor vehicle collections to the school districts. Although the Tax Commission may have been able in 2015 to predict that the Legislature was going to adopt an attendance-based method, this case requires us to interpret the statute in effect until the Legislature subsequently amended the statute.

D. The District Court's Judgment

¶35 The district court's interpretation of the 2015 version of section 1104 is consistent with this Court's interpretation. The district court ordered the Tax Commission to recalculate the amount the plaintiff school districts were entitled to receive for fiscal year 2016 and to base future distributions on the recalculated amount. We modify that portion of the district court's judgment. The Tax Commission shall recalculate the amount of motor vehicle collections that all eligible school districts should have received for fiscal year 2015 and base the future apportionment of funds on that amount consistent with the interpretation of the 2015 version of section 1104 in this Opinion. This method should govern until the effective date of the 2017 amendment. The plaintiffs do not seek, and we do not order, redistribution of motor vehicle collections received by the school districts in fiscal year 2015.

CONCLUSION

¶36 The Tax Commission has misinterpreted the effect of a 2015 amendment to section 1104 and consequently apportioned the wrong amount of motor vehicle collections to eligible school districts, including the plaintiffs. Between July 1, 2015, and August 25, 2017, the school districts should have received each month a percentage of the available funds based on the amount each district received in the corresponding month of the 2015 fiscal year. Any excess funds collected during September and December of 2015 and March of 2016 should have been distributed "so that each district shall first receive the cumulative total of the monthly apportionments for which it is otherwise eligible under subparagraph a . . . ." 47 O.S. Supp. 2015 § 1104(B)(2)(b). The Tax Commission shall recalculate the amount that should have been apportioned to the school districts pursuant to this method and base the apportionment of motor vehicle collections on the recalculated amounts for the July 1, 2016 to August 25, 2017 time period.

¶37 AFFIRMED AS MODIFIED.

RAPP, J., and GOODMAN, J., concur.

FOOTNOTES

[1] In this Opinion, we will the use the convention adopted by the school districts and the Tax Commission, identifying the fiscal year by the year in which it ends.

[2] The plaintiffs' petition was filed on June 15, 2016, before the start of the 2017 fiscal year. The injunctive relief that the plaintiffs sought could, and in this case did, affect how the funds are distributed in fiscal year 2017. The Tax Commission was on notice that might be a result of this litigation and, therefore, was in apposition to avoid "paying any money back" wrongly distributed in fiscal year 2017.

[3] Other recipients of motor vehicle collections have included the Tax Commission Reimbursement Fund, various county transportation projects, cities, the Oklahoma Law Enforcement Retirement Fund, the Wildlife Conservation Fund and the General Revenue Fund. See, e.g., 47 O.S. Supp. 1997 § 1104(A)(3) through (11). The funds allocated to other entities do not affect the application of section 1104 to the school districts, only the amount received by the districts. The other distributees are, therefore, not discussed in this Opinion.

[4] What is not apparent from this record is how the original amount distributed to any particular district was determined.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 1973 OK CIV APP 2, 510 P.2d 1013, REED v. CITY OF BARTLESVILLE
Discussed
 1979 OK CIV APP 1, 591 P.2d 335, CONSTRUCTION RESOURCES CORP. v. COURTS, LTD.
Discussed
 2017 OK CIV APP 16, 392 P.3d 295, DOBSON TELEPHONE CO. v. STATE ex rel. OKLA. CORPORATION COMM.
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1987 OK 114, 746 P.2d 1135, 58 OBJ 3282, Fair School Finance Council of Oklahoma, Inc. v. State
Discussed
 1992 OK 61, 832 P.2d 834, 63 OBJ 1368, Oglesby v. Liberty Mut. Ins. Co.
Discussed
 1994 OK 98, 880 P.2d 371, 65 OBJ 2520, Indiana Nat. Bank v. State Dept. of Human Services
Discussed
 1994 OK 136, 890 P.2d 1329, 65 OBJ 4037, Anderson v. Eichner
Discussed
 2001 OK 71, 33 P.3d 302, 72 OBJ 2703, SAMMAN v. MULTIPLE INJURY TRUST FUND
Discussed
 2003 OK 96, 81 P.3d 652, FULSOM v. FULSOM
Discussed
 2004 OK 84, 102 P.3d 670, HEAD v. McCRACKEN
Discussed
 2005 OK 27, 130 P.3d 213, YOCUM v. GREENBRIAR NURSING HOME
Discussed
 1996 OK 48, 914 P.2d 1051, 67 OBJ 1173, Carmichael v. Beller
Discussed
 2006 OK 89, 155 P.3d 32, IN RE: INITIATIVE PETITION NO. 379
Discussed
 1996 OK 125, 932 P.2d 1100, 67 OBJ 3566, Neil Acquisition, L.L.C. v. Wingrod Investment Corp.
Discussed
 2012 OK 3, 270 P.3d 151, DEUTSCHE BANK NATIONAL TRUST v. BRUMBAUGH
Discussed
 2012 OK 107, 292 P.3d 29, HOGG v. OKLAHOMA COUNTY JUVENILE BUREAU
Discussed
 2013 OK 100, 318 P.3d 206, TROXELL v. OKLAHOMA DEPT. OF HUMAN SERVICES
Cited
 2014 OK 52, 330 P.3d 519, MURRAY COUNTY v. HOMESALES, INC.
Discussed
 2016 OK 42, 371 P.3d 477, ROBINSON v. FAIRVIEW FELLOWSHIP HOME FOR SENIOR CITIZENS, INC.
Discussed
 2017 OK 63, 400 P.3d 759, NAIFEH v. STATE ex rel. OKLAHOMA TAX COMMISSION
Discussed
 2017 OK 80, 412 P.3d 1141, RAYMOND v. TAYLOR
Cited
 1982 OK 121, 654 P.2d 607, Oliver v. City of Tulsa
Discussed
 1985 OK 97, 714 P.2d 1013, 56 OBJ 2777, Oral Roberts University v. Oklahoma Tax Com'n
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2056, Motion for Summary Judgment
Discussed
 12 O.S. 1653, Declaratory Relief - Venue - Parties
Cited
Title 47. Motor Vehicles
 Cite
Name
Level

 47 O.S. 1101, Short Title
Cited
 47 O.S. 1104, Apportionment
Discussed at Length
Title 68. Revenue and Taxation
 Cite
Name
Level

 68 O.S. 3201, Imposition of Tax - Definitions
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA